The court may be seated. This is our last case of the act. In re the Marriage of Klaasen, 416-0033 for the appellant, Mr. Dancy, for the appellate, Mr. Jensen. You may proceed. Mr. Court, Mr. Jensen. I was sitting in the waiting room, and normally I, before oral argument, I'm a little more keyed up and the adrenaline's flowing. And I realized, I think, that there's a, in custody cases, when you can't reach an agreement, there is a real sense of, some sense of failure. When you have two smart parents who realize that working together for adolescence is in their best interests, and who can't seem to do it. I think that's really what was behind Judge Tucker's, his first order, his January, was a six-month temporary order. And it alternated the weeks, you know, and had Ms. Turner driving to Manitou. And I think the key factor that shows you his frustration, he said, you guys got to meet on Saturday or Sunday, and you got to sit down, and you got to talk. You got to actually talk in person to each other. And I think he was trying to do what maybe turned out to be the impossible, which is make them start doing it right. And so it's frustrating when you can't make smart people do what's right for their children. Some things, at this stage, it seems to me, a few of the parties agree upon. I don't think that either party thinks the court order can work effectively. Given the strains and the difficulties and the tone of communication and the resultant lack of fundamental cooperation, I don't think the parties think it's workable. Do the children think it's workable? I don't think it would, it's potentially workable for them, from their point of view, if I may, because they were consistent throughout, if they could stay in Manitou. I mean, one of the things the judge tried to do was give the mother more time. And she had every other weekend and two evenings a week. But she wanted more time, I mean, I would too. But what the children were consistently wanting was Manitou, where they've been all their lives, where all their friends are, where their extended family is, where their extended community is. But haven't they expressed satisfaction with the way the order has worked in the interim? They did, they did. They've also expressed that they don't want to go to the Beacon schools next year, and they don't want to leave what they have. And while that is an open question, I guess under the order, Ms. Turner has always indicated she wants them in Beacon, she wants them there. And there's certainly... Was there testimony that during the time, or in the year that she has the right to make education decisions, did she intend to put the children in the school in Beacon? In the future. Yes, no, coming in September. I don't think there was not testimony to that, no, Your Honor. But that has been her clear desire and intention. And under this order, is it your opinion that the next year, when educational decision-making went back to your client, he could move the children back to Manitou? He could bring them back to Manitou. I mean, that's one of the things that Julie and I just stared at each other about, is that you could have this going back and forth. And I've tried to wonder just what Judge Tucker was hoping to achieve. And I think he was hoping to require them to do it. I think part of it may be he thought they're going to have to compromise. You know, we sat outside the courthouse when we first got it, and came close, but couldn't get it done. But the way it's set up now, it's simply unworkable from either party's perspective, I believe. Do you think that that unworkability is primarily forgetting about their ability to communicate, but maybe taking into account their ability to compromise, if such ability exists, that the primary problem with this order is the alternating, the inability of alternating school districts year by year through these children's junior high and high school experience? Yes. They seem to have weathered the travel, which would have... I don't know that you would even say that they weathered it. As I read, it's almost as if they've thrived. They've got the week on, and I would have thought that was problematic, but the alternating weeks where Ms. Turner had to bring them back to Manitou, they were good with it. What grade are they in now? They're starting middle school, I believe, which is the sixth grade in Manitou. Which is why they get to, you know, there's now athletic teams, there's now... So, in your opinion, the court's interim order did work pretty well. Yes. Yeah. It gave... it satisfied their desire for more time with their mother. It put a stress on her, I'm sure, travel. Well, it's not that far... No, no, it's 20 minutes. It's 20 minutes. But no, I think the kids would say it worked okay. The problem is, from their perspective, and they were consistent throughout, they want to stay where they've been all their lives, and where all those connections are, where their friends are. And I think the court... the GAL, in her first report, mentioned that. It also mentioned that they fully recognized the tension between the parents. You can't really say anything to either one of them. And then she also said, because of the communication between the parents is so poor, because of the tensions, insults, and accusations, I question whether a change in placement will result... I question whether a change in placement will result in a better situation for the children. Without Ken and Kristen changing their own behaviors and improving their communication, a possible benefit of change in custody will not overcome the additional stress for the children. She modified that and softened it a bit at the end, but her report was consistent. They have never wavered in where they want to live and go to school. And so, you're faced with an order which, as it's styled, they don't want because of the potential of the change to Pekin, and which neither party wants. Both parties want full custody as a result of the inability to do it jointly. And so, I try to think of it from the court's perspective. And so, that is, well, then, if this one isn't workable, who decides what's workable? I mean, we both ask you, you know, make a decision on the record, give my client full custody, let's move on. And part of that is doing our client's bidding. Part of it has to do with the expense involved. Part of it has to do with the wear and tear on the children. I mean, these are smart kids. And they're aware of the problems, as they've indicated. And there's a wear and tear when your parents don't get along. There's a wear and tear and a worrying about where you're going to be next year and if you're going to have to move out. So, I would totally conclude, if you ask me what order do I want from you, maybe by the end of my time we'll have a solution. But it seems to me that you could decide it. Although, from a more logical perspective, it seems to me, we've got Judge Tucker there, who heard three and a half days of testimony, is much more intimately involved in the facts and the people. And you could tell him, this one doesn't work, the parties don't like it. Give him some guidance as to what you think he should do, but send it back to him for him to fashion something more or better. I'm afraid I'm to the point where I don't think the joint parenting works. They have not been able to do it. I see no, you can send them to Children's First and they went to Children's First and you can tell them they've got to talk. I don't see it happening. And this is just an aside because I went to an ICLE where I learned, with the new act, that the Supreme Court has indicated a positive approach to letting children of this age and older meet with the judge and have a say. The argument that I heard at my ICLE was that that gives them a greater respect and a greater acceptance of the decision that's made and a greater feeling that somebody listened to them. So if you end up sending it, depending on whatever you decide, if you end up sending it back, I would request, because we've requested twice, in-camera interviews with the children who want to speak to Judge Tucker, the decision maker, and it was objected to and denied twice, that you suggest or encourage him to get that input from the children if he's going to get it back and try to decide what to do. I mean, he was conflicted. I mean, that's why we've got the order we did. He didn't see a good solution. Is religion an issue? No. But that's actually mentioned in the order. Yeah, the person that gets to choose the education gets to choose the extracurriculars, which makes sense, and the other person chooses medical and religion. It seems to me you've got logistical problems if I'm the one with religion and I want him to go on Sunday to Manitou Church. I mean, the record is expansive. Your brief is the tone, which I'll make reference to later. We don't have any, I don't know that we have any questions. I'm not trying to cut short your argument. No, no, I had other stuff, but I think the back and forth has really focused on the essential problem with it. And I guess all, I won't go into the details, but as was noted by the GAL, and as I think is extensively set forth in the record, it's a joint responsibility. I think on practical matters, you find them communicating pretty well. You know, Christmas is coming up, when are you going to do it? When are you going to do it? That they do. Summer vacation, here's when I want them, here's when I want them, that one they do. When wrestling season came around, the two nights that they practiced were nights that she had them. She didn't like the fact that, so they moved one of them. So what I would call on the practical day-to-day stuff, they communicate okay. The kind of stuff that you can do by text or email. The kind of stuff that really isn't talking. But on the decision-making stuff, it is as Ann Mortola said, it's, what were her words? Tension, insults, and accusations, back and forth. It's a joint responsibility. Would it be accurate? Well, to the extent that you can comment on it, and not taking anything that's outside the record into account, or anything that's happened since the order was entered. Were the insults and recriminations more a thing of the past? When there were significant differences about medical decisions and the approach to illness, and some other things. Or have they continued up to the point of the interim order? And from the interim order until the final. I think they were more in the past. But I don't think, and I don't know that there were a lot of insults and accusations. Those were few. But the tone. The tone of the responses was confrontational and biting. And that just spreads down onto cooperation. If you have specific points you'd like to make, please feel free to do so. The only other one is, I grew up in Beacon. I was their age, a long time ago, 50, 55 years ago. And I could ride my bike to Mineral Springs Park. I could ride my bike across town and my grandmother would feed me. I didn't have to call ahead of time. I had freedom of movement. I had people around me. And they have that in them. And that, it's almost idyllic in retrospect. But what they can stop over and do without calling on a day-to-day basis to their grandma and their grandpa. And if she's baking cookies, they just walk down. If grandpa wants to go fishing, he takes him along. They've got people and fellow parents in the school and the community that know. And that aren't afraid, as in the old days, of saying, Ethan, you know, I mean, they're comfortable acting in loco parentis with other people's children in the small community. And that's healthy. And the only other thing I would stress, the bottom line is, they've done great where they are. And there's a risk that is not needed to be taken to move them out of that at this critical time in their life. That's all I have. Thank you. Thank you. May it please the court. Counsel Dancy. My name is Dustin Jensen. I'm with the firm Passport of Rock, Bell, and Coupler. I represent the petitioner, Kristen. We're asking the court today to reverse the trial court's grant of joint custody, not consider Ken Clawson's request for sole custody, and grant sole custody to Kristen Turner. Section 610 of the Illinois Marriage and Dissolution of Marriage Act, the act that governed this proceeding as it took place prior to 2016. In order to determine a custody determination, you must look at the best interests of the child. And those interests were determined by the factors set forth in section 602. Chief among those factors was factor number eight, which looked at the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and child. Illinois courts have given such great weight to this factor that they have granted sole custody to a facilitating parent when they found that the other parent was non-facilitating, despite the fact that the child was residing in the non-facilitating parent's home, had adjusted to their community, preferred to stay with the non-facilitating parent, bonded with the non-facilitating parent, and Illinois appellate courts have even done this in contravention of the recommendation of court-appointed experts, guardian ad litems, and even the facilitating parent. In other words, in cases where the facilitating parent only asked for joint custody, Illinois courts have given them sole custody because they hold this factor in such high regard. In this case, the evidence is unambiguous and uncontradicted in the fact that Mr. Claussen was unwilling or unable to facilitate and encourage a relationship between the minor children and Mrs. Turner. The GAL, in this case, the eyes and ears of the court, and the person tasked with representing the best interests of the child, after trial, after hearing testimony, did change her stance from the stance that Mr. Dancy represented to you just moments earlier. In fact, what she said after trial was that the testimony and evidence show clearly and convincingly that Ken Claussen has been unwilling to communicate openly with Kristen on matters pertaining to the well-being of their children, and has engaged in a long-term pattern of restricting her relationship with them. She concluded non-custodial does not mean non-parent, but this is essentially how Kristen has been regarded. With respect to Kristen, the GAL opined that Kristen has demonstrated not only her strong desire and intention to be intimately involved with the children, but also a willingness to initiate and facilitate communication between Ken and the children. In other words... But she's not willing to talk to Ken's wife. I'm unaware of that being a major issue. That's a co-parent. She doesn't want... I don't disagree with the point you're making about the facilitation, but one of the things I noticed, and please correct me, because there's a lot of material here. My understanding was, and there's nothing wrong with her saying, I would prefer to confer about my children through my ex-husband. But there's materials in the record that I read that suggested she said flatly, I don't really want any communication and I don't want any interaction, and I may be stating that more strongly than I should, with my husband's present wife. And yet, that present wife, whether custody is on one side or the other, is going to be just as significant as her husband, who she then wants to tout as a good father. How do those fit together in terms of facilitation? We're not trying to paint Ms. Turner as a perfect participant. Forget that part, forget the tout part. How does it work that you're going to be a facilitator if you won't even communicate with a person who has a very significant part in your children's lives no matter where custody occurs? Or where custody is placed? I guess I did not, and I could be wrong, as you said, the record was vast, but I was not aware of a blanket statement that Ms. Turner refused to deal with Mr. Clausen's current wife. No one will dispute that there were absolutely communication issues. And as you said, we are here. What I would ask the court to take note of is, like I said, Kristen is not a perfect participant in this matter. However, the GAL made clear that she made much more of a facilitating effort than did Ken. And the trial judge, the individual who sat through all the testimony and was tasked with making these decisions, indicated that the GAL hit the nail on the head when making this determination. Was your client ever asked if she would consider moving to Manitou? I don't know that she was ever asked. I'm pretty confident that there's no evidence in the record that she would be willing to move to Manitou. Her and Mr. Turner have a pretty good life established in Pekin at this point. Now, Kenneth argues, and counsel has argued, to this point, that regardless of the facilitation breakdown, that he should maintain sole custody, relying on really three factors in the 602 analysis. The wishes of the children, the interaction and interrelation of the children to people they have relationships with in Manitou, and as well as their adjustment to the community of Manitou. I would surmise to the court that those factors also support a grant of sole custody to Kristen, not Kenneth. With respect to the wishes of the children, as we pointed out in our brief, Illinois courts have said that children of this age, their wishes, while they should be considered, they're given less weight than if you're 16, 17 years old. They were 10 years old when they stated an intention or a preference to stay in Manitou. More importantly, Illinois courts have said that when the preference to stay in a certain community, or a certain residential situation, is due to friendships and school life, which is what Mr. Dancy represented to the court, were the reasons for their statements, in which I think the record is clear, were the reasons for the children's statements, that that again gives that preference less weight than if the preference was due to a bond to the parent. There's nothing in the record that I've come across that the children want to stay with Kenneth because they feel a closer bond than with Kristen. And in fact, if you look at the record, the GAL report indicates that the children said the exact opposite. During the six-month period where they're doing one week on, one week off with Kenneth and Kristen, all three children said they did not want to choose between their parents, but what's important is they did desire more time with Kristen. And so if you have a 50-50 split and you're asking for more time with one of the parents, that's a request, or a statement of preference, that sole custody goes with that parent. In this case, that was Kristen. Maybe I'm misunderstanding, but I thought that during the interim order period there was the expression that they were enjoying having more time with their mother and didn't make any reference to it needing to be more than that. Let me double-check, but I'm pretty confident that it was a request for more time. You're right as far as the GAL report. There may have been in the testimony that took place with respect to that supplemental report, I'm very confident that somewhere in the record they did indicate they wanted more time with Kristen. They indicate that too. The GAL, who then indicated it to the court. Is that in the GAL's report? I believe it was in her testimony. It's in our reply brief, and so if it's not in the reply brief, then I am mistaken. With respect to the third factor, the interaction and interrelation between the kids and individuals in their current setting, I think the record is pretty clear that Kenna's inability to maintain positive relationships himself have affected the children negatively. He got upset with his parents, and that disallowed the children to see their grandparents, and the parents expressed concern to Kristen about that incident. The same happened with his brother and his family, causing one of the children to state concerns to Kristen that that cousin didn't like her anymore. But it wasn't because of anything the child did. It was because Kenneth had gotten in a fight and was not allowing his kids to see his family. Conversely, there's evidence that in both of those situations, Kristen took the initiative to let the kids see Kenneth's family, to try to maintain those relationships. There's also no evidence of similar family strife or relationship breakdowns in the Turner household. Finally, and kind of ancillarily related to this factor, the work schedules would make sole custody make so much more sense for Kristen. Kristen has a flexible work schedule. She works three days a week, works from home the other days, and even when she has to go into work, she's home before the kids get home from school. Conversely, Kenneth works 12-hour shifts. This has required him to allow drug makers and drug doers to watch their kids. And I'd point out that was in violation of the JPA's requirement that he give Kristen the right of first refusal. But in any respect, the relationships are much more stable in the Turner household than they are in the Klassen household. How about the relationships with the children in the Klassen household? There was evidence that the relationships are fine with the children in the Klassen household, but there was also evidence that the relationships were just as fine with the children in the Turner household. And that actually How many children are in the Turner household? Just one. How many children are in the Klassen? Five additional. With the spread of ages and one of the triplets testifying, that's my go-to person. The stepbrother. But I think that some of this testimony comes back to what we view as the overall issue in this case is that maybe those relationships and I wouldn't even say maybe, I would say those relationships would be just as strong had Kenneth allowed for more participation encouraged more facilitated more participation with Kristen. The GAL was very clear on this point. That the kids wanted to do more activities in Pekin. They were afraid that they did not like when Kristen asked for them to do more activities in Pekin because they knew Kenneth would get upset. And Kenneth flat out told the GAL that he doesn't let them do stuff in Pekin because that's not their community. But they were didn't they sign up for something in Pekin and do it? I would submit to the court that if you look at the timeline of some of this stuff they were shut out from doing stuff in Pekin until the petition was filed. I don't disagree with that. But then something did successfully happen in Pekin. For sure. And I think that goes onto an overall theme that we fit on in both of our briefs that Kenneth does stuff that he thinks is necessary to win a trial. He doesn't necessarily do things that he thinks is necessary for the best interests of the children. Once he sees a potential consequence then he starts to change his actions. Well one of the things that occurs to me and I intended to say this to Mr. Dancy as well is this is a it's a unique case it's a strange and unique judgment order that it almost seems as if what's best for the children or one could argue what's best for the children is what's going on right now but what's in the best interest of the parents is to have one of them feel that they're in charge and I don't think that's what the act contemplates but at the same time I recognize that there is stress on the children and there is disruption but usually when you're talking about the best interest of the children you don't have children that are thriving you don't have children that cooperate better than their parents do you don't have children that have loving relationships on both sides of the family and you also don't have an exposure to a wide range of activities because each of these families obviously have a different lifestyle and some people paint that as bad and dysfunctional or dysfunctional and confusing others might say that's exposing them to a wide world but Manitou is not the wide world if I could push back on that just a little bit is that yes the kids are remarkably persistent, adaptable resilient and I think both counsel agree to that and I think that that only maybe not a huge check but it is kind of something to consider and would a sole custody award to Kristen be appropriate is the fact that the children and the GAL testified to this, adapt well and the change in community would not be an issue. The other thing that I would like to push back on a little bit on the I guess the statement that the children are thriving or doing well is that it's very clear that the children know that Kenneth's refusal to facilitate and encourage a positive relationship with and they don't want to ask to do things with Kristen because they know that's an issue so while the children may be able to be resilient enough to deal with this one week on, one week off, one week on, one week off the fact of the matter remains that the major factor implicated by the record is the facilitation and lack thereof and the children are aware of it they're upset by it and they don't do things that they would otherwise like to do because of it and so if we're looking at the best interests of the child which as Mr. Dancy stated and I wholeheartedly agree that this one week on, one week off, you can change schools every year you can change religions every year will not serve the best interests of the children even if it does so maybe in the past year it won't for very long that you have to look at what are these best interest factors the three that he's hung his hat on, I've just stated why I believe that they're marginal at best if they don't support a sole custody award to Kristen but the big factor is factor eight that's the glaring factor from this record and that factor the GAL said Kenneth refuses to facilitate Kristen does a good job of facilitating the judge said the GAL hit the nail on the head when she made that observation I would just like to very quickly before my time runs out I would like to touch the point of our motion to strike the brief and the appeal opposing council has filed a brief that's over the page limitation. It's not over the page limitation because this is a cross appeal he cited the wrong rule I was prepared to strike the brief and I realized I had it called to my attention wait a minute, this is a cross appeal, he can go to 80 pages then I started looking at the brief more closely and yes it's true that the spacing is not correct in the last 20 pages or whatever it is but if the spacing had been correct it would have still been under 80 pages which the rule provides is permissible your honor I understand on a cross appeal that you do get an extra 20 pages but his brief was not a cross appeal brief it was his appellant brief then my brief would have been allowed an extra 20 pages his reply would have been allowed an extra 20 pages so that's why we think that he's still in violation of the rule even though this is a cross appeal his brief did not have anything to do with my appeal it was his appellant brief we think he should have been subjected to 50 pages in that case he's 57 with the last 7 being single spaced and I would point out too that in his record as well as his reply brief there's no citation to the record in the reply brief no citation to Illinois law which is also cause of strike thank you very much your honor I called I don't want to hear more about the briefs I called the clerk's office to say am I right do I get an extra 30 I said I don't want to hear anymore about the briefs the only factor they think they have is factor 8 is the encouragement and facilitation the wishes of the children have been consistent throughout this is the GAO's final report she found all three children very clear about not wanting to go back to the old schedule but liking the greater involvement with Krista all of them are great kids she indicated that the children liked the additional time she admitted the children continued in their desire not to change schools and to stay in Manitoba that was the last that's the wishes of the children and those are the wishes of the children I'm sorry I get a little perturbed when they say that my guy's the Maki of L.E.N. and the only reason they're that way is because he's manipulated the issue with his parents is an example of the benefits of that they were running around and they got in his dad's garden this was three years ago and his dad cares a lot about his garden and his dad yelled at the kids and Ken was not going to put up with that kind of yelling from his dad so they just stayed away from his dad they saw each other they went to games but there was a breach that then was solved appropriately and a healing occurred from that they never were out of touch with the grandparents it's an example of learning how to deal with family conflicts the richness of their lives cannot be denied and this the drug makers and that's just baloney well somebody babysat the children that had a criminal record is that accurate? no somebody's brother-in-law the babysitter was Kristen Martin not Frank Tennyson Frank was around because that's her boyfriend but he had a drug record he had a drug record but the court really didn't see much the fruit of what one's efforts are is what tells us how you're doing and these kids are great kids and they're not great kids because Ken Clausen is a lousy parent and is trying to the record is clear with respect to his efforts to communicate and then I will go back with respect to that there is Kristen Turner's letter of April 26, 2013 to Ken in which basically she calls for his surrender she accuses him of gross neglect severe instability of home like lack of care and attention and the whole tone and style of that demand letter shows her emotional approach to communication with Mr. Clausen she's part and parcel of the problem that's her tone and then there is this email on May the 8th right before mediation because we were mediating about shoes and some other things and Ken inquires as to whether there is something that can be talked about in mediation Ken says I'll discuss all matters in mediation and her reply is I hope you understand this mediation is not about shoes and baseball this mediation is a courtesy to you before I serve you papers to get custody of the kids I'm not interested in cooperation and finally I really don't know what to do with this one your honor in answer to the question as to whether she communicated with Jennifer Clausen the triplet's mother she indicated no I inquired do you believe that communication between you and she would be in the children's best interest not really I would prefer to deal with her data do you think that better communication between Ken and her husband would be in the best interest of the children answer no and the GAL in her report had pretty much indicated both of the step parents were willing to be facilitators both of the step parents were frustrated by that that's her tone that's her approach it's a mutual problem thank you I hope both of your clients realize that there's the possibility of loss this case could result in custody being granted to one or the other and it seems to me that that should have been taken into account before pursuing further litigation